**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TINA SCHAFFER,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 09-1254** |
| | ) | **Electronically Filed** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

## I.    Introduction

Plaintiff Tina Schaffer ("Schaffer") brings this action pursuant to 42 U.S.C. §§ 405(g)

and 1383(c)(3), seeking review of the final determination of the Commissioner of Social Security

("Commissioner") denying her applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act

("Act") [42 U.S.C. §§ 401-433, 1381-1383f].  Consistent with the customary practice in the

Western District of Pennsylvania, the parties have filed cross-motions for summary judgment on

the record developed during the administrative proceedings.  Doc. Nos. 8 & 10.

After careful consideration of the Commissioner's decision, the memoranda of the

parties, and the entire evidentiary record, the Court finds that the Commissioner's decision must

be vacated, and that the case must be remanded for further proceedings pursuant to the fourth

sentence of § 405(g).  Therefore, the Court will deny the Commissioner's motion for summary

judgment, deny Schaffer's motion for summary judgment insofar as it seeks an award of benefits,

and grant Schaffer's motion for summary judgment insofar as it seeks a vacation of the

1

Commissioner's decision, and a remand for further administrative proceedings.

## II.     Procedural History

Schaffer protectively applied for DIB and SSI benefits on March 1, 2007, alleging disability as of June 30, 2005.  R. 83, 87, 105.  The applications were denied by the state agency on August 13, 2007.  R. 62, 66.  Schaffer responded on September 20, 2007, by filing a timely request for an administrative hearing.  R. 73.  On February 18, 2009, a hearing was held in Pittsburgh, Pennsylvania, before Administrative Law Judge Michael F. Colligan (the "ALJ").  R. 21.  Schaffer, who was represented by counsel, appeared and testified at the hearing.  R. 24-40. Samuel Edelman ("Edelman"), an impartial vocational expert, also testified at the hearing.  R. 40-43.

In a decision dated April 7, 2009, the ALJ determined that Schaffer was not "disabled" within the meaning of the Act.  R. 9-20.  The Appeals Council denied Schaffer's request for review on August 21, 2009, thereby making the ALJ's decision the final decision of the Commissioner in this case.  R. 1.  Schaffer commenced this action on September 16, 2009, seeking judicial review of the Commissioner's decision.  Doc. No. 1.  Schaffer and the Commissioner filed motions for summary judgment on January 11, 2010, and January 15, 2010, respectively.  Doc. Nos. 8 & 10.  These motions are the subject of this memorandum opinion.

## III.    Statement of the Case

In his decision, the ALJ made the following findings:

1.     The claimant met the insured status requirements of the Social Security Act through September 30, 2008.

2.     The claimant has not engaged in substantial gainful activity since June 30, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

2

3.    The claimant has the following severe impairments: schwanoma of the lumbar spine, back pain, history of neurogenic bladder, mood disorder and panic disorder (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except claimant cannot engage in repetitive bending, cannot use foot/pedal controls with the left foot, is limited to simple routine repetitive tasks performed in a low stress environment, must have minimal contact with the public, and must have reasonable access to bathroom facilities.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on March 19, 1979 and was 26 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

R. 14-20.  Schaffer's arguments all relate, in one form or another, to the ALJ's alleged failure to

properly consider her need to persistently access restroom facilities.  Doc. No. 9, pp. 3-12.

IV.    **Standards of Review**

Judicial review of the Commissioner's final decisions on disability claims is provided by statute.  42 U.S.C. §§ 405(g)[1] and 1383(c)(3)[2].  Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based.  Because the standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding e standards under Title XVI (42 U.S.C. §§ 1381-1383f, regarding Supplemental Security Income, or "SSI"), regulations and decisions rendered under the Title II disability standard, 42 U.S.C. § 423, are pertinent and applicable in Title XVI decisions rendered under 42 U.S.C. § 1381(a).  *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3 (1990); *Burns v. Barnhart*, 312 F.3d 113, 119 n.1 (3d Cir. 2002).

<u>Substantial Evidence</u>

If supported by substantial evidence, the Commissioner's factual findings must be accepted as conclusive.  *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995); *Wallace v. Secretary of HHS,* 722 F.2d 1150, 1152 (3d Cir. 1983). The district court's function is to

---

[1]  Section 405(g) provides in pertinent part:
Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business. . .
42 U.S.C. § 405(g).

[2] Section 1383(c)(3) provides in pertinent part:
The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.
42 U.S.C. § 1383(c)(3).

4

determine whether the record, *as a whole*, contains substantial evidence to support the Commissioner's findings. *See Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir.1994) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Supreme Court has explained that "substantial evidence" means "more than a mere scintilla" of evidence, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401 (citation omitted). *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005); *Ventura*, 55 F.3d at 901 (*quoting Richardson*); *Stunkard v. Secretary of HHS*, 841 F.2d 57, 59 (3d Cir. 1988).

The United States Court of Appeals for the Third Circuit has referred to this standard as "less than a preponderance of the evidence but more than a mere scintilla."*Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002), *quoting Jesurum v. Secretary of the Dep't of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). "A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala,* 994 F.2d 1058, 1064 (3d Cir. 1993), *quoting Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). The substantial evidence standard allows a court to review a decision of an ALJ, yet avoid interference with the administrative responsibilities of the Commissioner. *See Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir.1983).

In reviewing the record for substantial evidence, the district court does not weigh the evidence or substitute its own conclusions for those of the fact finder. *Rutherford*, 399 F.3d at 552. In making this determination, the district court considers and reviews only those findings upon which the ALJ based his or her decision, and cannot rectify errors, omissions or gaps in the medical record by supplying additional findings from its own independent analysis of portions of

the record which were not mentioned or discussed by the ALJ. *Fargnoli v. Massarini,* 247 F.3d 34, 44 n.7 (3d Cir. 2001) ("The District Court, apparently recognizing the ALJ's failure to consider all of the relevant and probative evidence, attempted to rectify this error by relying on medical records found in its own independent analysis, and which were not mentioned by the ALJ. This runs counter to the teaching of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), that '[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.' *Id.* at 87"; parallel and other citations omitted).

Five Step Determination Process

To qualify for DIB under Title II of the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987);  42 U.S.C. § 423 (d)(1) (1982). Similarly, to qualify for SSI, the claimant must show "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1383c(a)(3)(A).

When resolving the issue of whether a claimant is disabled and whether the claimant is entitled to either DIB or SSI benefits, the Commissioner utilizes the familiar five-step sequential evaluation process. 20 C.F.R. §§ 404.1520 and 416.920 (1995).  *See Sullivan*, 493 U.S. at 525. The Court of Appeals for the Third Circuit summarized this five step process in *Plummer v. Apfel*, 186 F.3d 422 (3d Cir.1999):

In *step one*, the Commissioner must determine whether the claimant is

currently engaging in substantial gainful activity. 20 C .F.R. § 404.1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. . . . In *step two*, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.

In *step three*, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. *Step four* requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. . . .

If the claimant is unable to resume her former occupation, the evaluation moves to the final *step* [*five*]. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ *must analyze the cumulative effect of all the claimant's impairments* in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step. . . .

*Plummer*, 186 F.3d at 428 (italics supplied; certain citations omitted). *See also Rutherford*, 399

F.3d at 551 ("In the first four steps the burden is on the claimant to show that she (1) is not

currently engaged in gainful employment because she (2) is suffering from a severe impairment

(3) that is listed in an appendix (or is equivalent to such a listed condition) or (4) that leaves her

lacking the RFC to return to her previous employment (Reg. §§ 920(a) to (e)). If the claimant

satisfies step 3, she is considered per se disabled. If the claimant instead satisfies step 4, the

burden then shifts to the Commissioner at step 5 to show that other jobs exist in significant

numbers in the national economy that the claimant could perform (Reg. § 920(f)).").

Thus, a claimant may demonstrate that his or her impairment is of sufficient severity to

qualify for benefits in one of two ways:

(1)  by introducing medical evidence that the claimant is disabled *per se* because he or she meets the criteria for one or more of a number of serious Listed Impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1, or that the impairment is *equivalent* to a Listed Impairment.  *See Heckler v. Campbell*, 461 U.S. 458, 460 (1983);  *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777 (Steps 1-3); or,

(2) in the event that the claimant suffers from a less severe impairment, he or she will be deemed disabled where he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ."  *Campbell*, 461 U.S. at 461 (*citing* 42 U.S.C. § 423 (d)(2)(A)). In order to prove disability under this second method, the plaintiff must first demonstrate the existence of a medically determinable disability that precludes him or her from returning to his or her former job (Steps 1-2, 4).  *Stunkard,* 841 F.2d at 59;  *Kangas*, 823 F.2d at 777.  Once it is shown that he or she is unable to resume his or her previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given the plaintiff's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy.  *Campbell*, 461 U.S. at 461; *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003); *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777.

<u>Vocational Expert - Hypothetical Questions</u>

The determination of whether a claimant retains the RFC to perform jobs existing in the workforce at step 5 is frequently based in large measure on testimony provided by the vocational expert.  *Rutherford*, 399 F.3d at 553, citing *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir.

1984) (citations omitted).  Where a hypothetical question to the VE accurately sets forth all of a

claimant's significant impairments and restrictions in activities, physical and mental, as found by

the ALJ or as  uncontradicted on the medical record, the expert's response as to the existence of

jobs in the national economy which the claimant is capable of performing may be considered

substantial evidence in support of the ALJ's findings as to the claimant's RFC. *See, e.g., Burns v.

Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002), *citing Podedworny*, 745 F.2d at 218 *and Chrupcala

v. Heckler*, 829 F.2d, 1276 (3d Cir. 1987) (leading cases on the use of hypothetical questions to

VEs).[3]  *See also Plummer*, 186 F.3d at 428 (factors to be considered in formulating hypothetical

questions include medical impairments, age, education, work experience and RFC); *Boone*, 353

F.3d at 205-06 ("At the fifth step of the evaluation process, 'the ALJ often seeks advisory

testimony from a vocational expert.'").  Objections to the adequacy of an ALJ's hypothetical

questions to a vocational expert "often boil down to attacks on the RFC assessment itself."

*Rutherford*, 399 F.3d at 554 n.8.

Additionally, the ALJ will often consult the Dictionary of Occupational Titles ("DOT"), a

publication of the United States Department of Labor that contains descriptions of the

requirements for thousands of jobs that exist in the national economy, in order to determine

whether any jobs exist that a claimant can perform. *Burns v. Barnhart*, 312 F.3d 113, 119 (3d

Cir. 2002); see also *id.* at 126 (The "Social Security Administration has taken administrative

notice of the reliability of the job information contained in the [DOT].") (citing 20 C.F.R. §

---

[3]Conversely, because the hypothetical question posed to a vocational expert "must reflect
all of a claimant's impairments," *Chrupcala*, 829 F.2d at 1276, where there exists on the record
"medically undisputed evidence of specific impairments not included in a hypothetical question
to a vocational expert, the expert's response is not considered substantial evidence." *Podedworny*,
745 F.2d at 218.

416.966(d) (2002)).  While an unexplained conflict between a VE's testimony and the relevant DOT job descriptions does not *necessarily* require reversal or remand of an ALJ's determination, the United States Court of Appeals for the Third Circuit requires the ALJ to address and resolve any material inconsistencies or conflicts between the DOT descriptions and the VE's testimony, and failure to do so will necessitate a remand.  *Boone*, 353 F.3d at 206.

<u>Multiple Impairments</u>

Where a claimant has multiple impairments which, individually, may not reach the level of severity necessary to qualify as a Listed Impairment, the ALJ/ Commissioner nevertheless must consider all of the claimant's impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Burnett*, 220 F.3d at 122 ("the ALJ must consider the combined effect of multiple impairments, regardless of their severity"); *Bailey v. Sullivan*, 885 F.2d 52 (3d Cir. 1989) ("in determining an individual's eligibility for benefits, the 'Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity,'"), *citing* 42 U.S.C. § 423(d)(2)(C), and 20 C.F.R. § § 404.1523, 416.923).

Section 404.1523 of the regulations, 20 C.F.R. § 404.1523, Multiple impairments, provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520).

10

Even if a claimant's impairment does not meet the criteria specified in the listings, he or she must be found disabled if his or her condition is *equivalent* to a listed impairment. 20 C.F.R. § 404.1520(d). When a claimant presents more than one impairment, "the combined effect of the impairment must be considered before the Secretary denies the payment of disability benefits." *Bittel v. Richardson*, 441 F.2d 1193, 1195 (3d Cir.1971) . . . ."). To that end, the ALJ may not just make conclusory statements that the impairments do not equal a listed impairment in combination or alone, but must set forth the reasons for his or her decision, and *specifically* explain why he or she found that the claimant's impairments did not, alone or in combination, equal in severity one of the listed impairments. *Fargnoli ,* 247 F.3d at 40 n. 4, *citing Burnett*, 220 F.3d at 119-20.

If the ALJ or Commissioner believes that the medical evidence is inconclusive or unclear as to whether the claimant is unable to return to his or her past employment or perform other substantial gainful activities, it is incumbent upon the ALJ to "secure whatever evidence [he/she] believed was needed to make a sound determination." *Ferguson*, 765 F.2d 36.

<u>Claimant's Subjective Complaints of Impairments and Pain</u>

An ALJ must do more than simply state factual conclusions.  Instead, he or she must make specific findings of fact to support his or her ultimate findings. *Stewart*, 714 F.2d at 290. The ALJ must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence, especially when testimony of the claimant's treating physician is rejected.  *See Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir.1984);  *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir.1981).  He or she must also give serious consideration to the claimant's subjective complaints, even when those assertions are not fully confirmed by objective

medical evidence.  *See Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir.1993);  *Welch v. Heckler,* 808 F.2d 264, 270 (3d Cir.1986).

Pain alone, if sufficiently severe, may be a disabling impairment that prevents a claimant from performing any substantial gainful work. *E.g., Carter v. Railroad Retirement Board,* 834 F.2d 62, 65, *relying on Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984); *Smith v. Califano,* 637 F.2d 968, 972 (3d Cir. 1981); *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979). Similarly, an ALJ must give great weight to a claimant's subjective description of his or her inability to perform even light or sedentary work when this testimony is supported by competent evidence. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999), *relying on Dobrowolsky.* Where a medical impairment that could reasonably cause the alleged symptoms exists, the ALJ must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work.  This obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.   *See* 20 C.F.R. § 404.1529(c).  *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).

If an ALJ concludes that the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision.  *See Cotter*, 642 F.2d at 705. Our Court of Appeals has stated:  "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations.   The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the

individual's ability to work." *Schaudeck*, 181 F.3d at 433.

Subjective complaints of pain need not be "fully confirmed" by objective medical evidence in order to be afforded significant weight.  *Smith*, 637 F.2d at 972; *Bittel*, 441 F.2d at 1195.  That is, while "there must be objective medical evidence of some condition that could reasonably produce pain, *there need not be objective evidence of the pain itself*." *Green,* 749 F.2d at  1070-71 (emphasis added), *quoted in Mason,* 994 F.2d at 1067.  Where a claimant's testimony as to pain is reasonably supported by medical evidence, neither the Commissioner nor the ALJ may discount the claimant's pain *without contrary medical evidence*. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985);  *Chrupcala v. Heckler*, 829 F.2d 1269, 1275-76 (3d Cir. 1987); *Akers v. Callahan,* 997 F.Supp. 648, 658 (W.D.Pa. 1998).  "Once a claimant has submitted sufficient evidence to support his or her claim of disability, the Appeals Council may not base its decision upon mere disbelief of the claimant's evidence.  Instead, the Secretary must present *evidence to refute the claim.  See Smith v. Califano*, 637 F.2d 968, 972 (3d Cir.1981) (where claimant's testimony is reasonably supported by medical evidence, the finder of fact may not discount the testimony without contrary medical evidence)." *Williams v. Sullivan,* 970 F.3d 1178, 1184-85 (3d Cir. 1992) (emphasis added), *cert. denied* 507 U.S. 924 (1993).

In making his or her determination, the ALJ must consider and weigh all of the evidence, both medical and non-medical, that support a claimant's subjective testimony about symptoms and the ability to work and perform activities, and must specifically explain his or her reasons for rejecting such supporting evidence. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 119-20 (3d Cir. 2000). Moreover, an ALJ may not substitute his or her evaluation of medical records and documents for that of a treating physician; "an ALJ is not free to set his own

expertise against that of a physician who presents competent evidence" by independently

"reviewing and interpreting the laboratory reports . . . ." *Ferguson v. Schweiker*, 765 F.2d 31, 37

(3d Cir. 1985).

Medical Opinions of Treating Sources

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord

treating physicians' reports great weight, especially 'when their opinions reflect expert judgment

based on a continuing observation of the patient's condition over a prolonged period of time.'

*Plummer*, 186 F.3d at 429 (*quoting Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d  Cir.1987)) . . . ."

*Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (additional citations omitted). The ALJ must

weigh conflicting medical evidence and can chose whom to credit, but "cannot reject evidence

for no reason or for the wrong reason." *Id.* at 317, *quoting Plummer*, 186 F.3d at 429 (additional

citations omitted). The ALJ must consider all medical findings that support a treating physician's

assessment that a claimant is disabled, and can only reject a treating physician's opinion on the

basis of contradictory medical evidence, not on the ALJ's own credibility judgments, speculation

or lay opinion. *Morales*, 225 F.3d at 317-318 (citations omitted).

Moreover, the Commissioner/ALJ

> must "explicitly" weigh all relevant, probative and available evidence. . . . [and]
> must provide some explanation for a rejection of probative evidence which
> would suggest a contrary disposition. . . . The [Commissioner] may properly
> accept some parts of the medical evidence and reject other parts, but she must
> *consider* all the evidence and *give some reason for discounting* the evidence she
> rejects.

*Adorno*, 40 F.3d at 48 (emphasis added; citations omitted). *See also Fargnoli,* 247 F.3d at 42-43

(although an ALJ may weigh conflicting medical and other evidence, he or she must give some indication of the evidence that he or she rejects and explain the reasons for discounting the evidence; where an ALJ failed to mention significant contradictory evidence or findings, the Court was left to wonder whether he considered and rejected them, or failed to consider them at all, giving the Court "little choice but to remand for a comprehensive analysis of the evidence consistent with the requirements of the applicable regulations and the law of this circuit. . . ."); *Burnett*, 220 F.3d at 121 ("In making a residual functional capacity determination, the ALJ must consider all evidence before him. . . .  Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. . . . 'In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.' *Cotter*, 642 F.2d at 705.") (additional citations omitted).

Medical Source Opinion of "Disability"

A medical statement or opinion expressed by a treating source on a matter reserved for the Commissioner, such as a statement that the claimant is "disabled" or "unable to work," is not dispositive or controlling. *Adorno*, 40 F.3d at 47-48, *citing Wright v. Sulllivan*, 900 F.2d 675, 683 (3d Cir. 1990) ("this type of [medical] conclusion  cannot be controlling. 20 C.F.R. § 404.1527 (1989) indicates that [a] statement by your physician that you are disabled or unable to work does not mean that we will determine that you are disabled. We have to review the medical findings and other evidence that support a physician's statement that you are disabled.") (internal citations omitted).

The rules and regulations of the Commissioner and the SSA make a distinction between

(i) medical opinions about the nature and severity of a claimant's impairments, including

symptoms, diagnosis and prognosis, what the claimant can still do despite impairments, and

physical or mental restrictions, on the one hand, and (ii) medical opinions on matters reserved for

the Commissioner, such as an opinion that a claimant is "disabled" or "unable to work," on the

other. The latter type of medical opinions are on matters which require dispositive administrative

findings that would direct a determination of disability. *Compare* 20 C.F.R. §404.1527(a-d)

(2002) (consideration and weighing of medical opinions) *with* 20 C.F.R. §404.1527(e) (2002)

(distinguishing medical opinions on matters reserved for the Commissioner).

  The regulations state that the SSA will "always consider medical opinions in your case

record," and states the circumstances in which an opinion of a treating source is entitled to

"controlling weight." 20 C.F.R. §404.1527(b), (d) (2002).[4]  Medical opinions on matters reserved

_____

[4]Subsection (d) states: "How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider [a list of] factors in deciding the weight we give to any medical opinion." 20 C.F.R. 404.1527(d) (2002). Subsection (d)(2) describes the "treatment relationship," and states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual  examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, *we will give it controlling weight*. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in  paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. *We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion*.

for the Commissioner are not entitled to "any special significance," although they must always be considered. 20 C.F.R. §404.1527(e)(1-2) (2002). The Commissioner's Social Security Ruling ("SSR") 96-2p, "Policy Interpretation Ruling, Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," and SSR 96-5p, "Policy Interpretation Ruling, Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner," explain in some detail the distinction between medical opinions entitled to controlling weight and those reserved to the Commissioner.

SSR 96-2p explains that a "finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." SSR 96-2p, Purpose No. 7. Where a medical opinion is not entitled to controlling weight or special significance because it is on an issue reserved for the Commissioner,[5] these Social Security Rulings provide that, because an adjudicator is required to evaluate *all* evidence in the record that may bear on the determination or decision of disability, "adjudicators must *always* carefully consider medical source opinions about any issue, including opinions about those issues that are reserved to the Commissioner," and that such opinions "must *never* be ignored. . . ." SSR 96-5p, Policy Interpretation, (emphasis added). Moreover, because the treating source's opinion and other evidence is "important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner

20 C.F.R. § 404.1527(d)(2) (2002) (emphasis added).

[5]SSR 96-5p lists several examples of such issues, including whether an individual's impairment(s) meets or equals in severity a Listed Impairment, what an individual's RFC is and whether that RFC prevents him or her from returning to his or her past relevant work, and whether an individual is "disabled" under the Act.

and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." *Id.*

A medical opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence in [the] case record . . ." 20 C.F.R. § 404.1527 (d)(2). *See* note 4, *supra*. Where an opinion by a medical source is not entitled to controlling weight, the following factors are to be considered: the examining relationship, the treatment relationship (its length, frequency of examination, and its nature and extent), supportability by clinical and laboratory signs, consistency, specialization and other miscellaneous factors. 20 C.F.R. § 404.1527 (d)(1-6).

<u>State Agency Medical and Psychological Consultants</u>

Medical and psychological consultants of a state agency who evaluate a claimant based upon a review of the medical record "are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings of State agency medical and psychological consultants or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether [a claimant is] disabled." 20 C.F.R. § 404.1527 (f)(2)(I). See also SSR 96-6p: Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants ("1. Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review. 2.

18

Administrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.").

## V.    Discussion

In his opinion, the ALJ determined that Schaffer could not return to her past relevant work as a housekeeper, teacher's aide or bakery helper. R. 19. Nevertheless, he concluded that she could work as a hand packer, assembler or sorter/grader. R. 20. Edelman's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). R. 42.

At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003). In certain instances, this burden can be carried simply by reference to the Medical-Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Medical-Vocational Guidelines"). *Heckler v. Campbell*, 461 U.S. 458, 467-470 (1983). Where a claimant has both exertional and nonexertional limitations, however, the Commissioner cannot rely solely on the Medical-Vocational Guidelines, and must present vocational evidence (which usually takes the form of testimony given by a vocational expert) of the existence of jobs in the regional or national economy that are consistent with the claimant's residual functional capacity and vocational background. *Sykes v. Apfel*, 228 F.3d 259, 273 (3d Cir. 2000). Where the Commissioner opts to rely on vocational expert testimony to satisfy his burden, the administrative law judge's hypothetical question to the vocational expert must incorporate *all* of the claimant's functional

limitations. *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). The United States Court of

Appeals for the Third Circuit has held that where a hypothetical question posed to a vocational

expert does not "adequately convey" all of the claimant's limitations, the vocational expert's

testimony cannot constitute "substantial evidence" of the existence of jobs consistent with the

claimant's residual functional capacity. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir.

2004).

In this case, the ALJ's hypothetical question did not "adequately convey" to Edelman

limitations that were of central importance to Schaffer's case. The ALJ concluded that Schaffer

was capable of performing a limited range of sedentary work that, *inter alia*, provided her with

"reasonable access to bathroom facilities." R. 16. His corresponding hypothetical question to

Edelman, and Edelman's response to that question, consisted of the following:

> Q.   And for the purposes of the next question, I'm going to ask that you
>      assume that we have an individual of the same age, education and work
>      history as this claimant. In addition, assume that on an exertional basis,
>      the individual would be limited to sedentary work. I have some additional
>      restrictions, could not engage in repetitive bending, could not operate foot
>      or pedal controls by her left foot and would need to work in a low stress
>      work environment. By this I mean a work environment where the
>      individual would not have to perform more than simple, routine, repetitive
>      tasks and not have more than minimal contact with the public. Also, the
>      individual would need to have reasonable access to bathroom facilities.
>      Considering these things, do you have an opinion as to whether or not
>      there are jobs that exist in the seven regions of the national economy that
>      such an individual could perform?
>
> A.   With those, find there was just hand packager, 202,000 jobs nationally;
>      assembler, 156,000 jobs nationally; for sorter/grader, 70,000 jobs
>      nationally.

R. 41-42. The ALJ relied on Edelman's testimony in determining that jobs consistent with

Schaffer's residual functional capacity existed in the national economy.  R. 20.  Because the phrase "reasonable access to bathroom facilities" did not fully account for Schaffer's urinary and excretory limitations, Edelman's testimony was not sufficiently informed to carry the Commissioner's burden at the fifth step of the sequential evaluation process.

In determining that Schaffer was not "disabled" within the meaning of the Act, the ALJ relied primarily on residual functional capacity assessment forms completed by Dr. Anthony J. Fallica ("Dr. Fallica"), Dr. Douglas Schiller ("Dr. Schiller"), and William Barnes ("Barnes").  R. 17-18.  Dr. Fallica performed a consultative psychological evaluation of Schaffer on June 19, 2007.  R. 235-241.  Dr. Schiller, a nonexamining medical consultant, completed a "mental residual functional capacity assessment" form regarding Schaffer on July 26, 2007.  R. 245-261.  Both Dr. Fallica and Dr. Schiller opined that Schaffer's mental impairments were not disabling.  R. 243-247.  On August 1, 2007, Barnes completed a "physical residual functional capacity assessment" form indicating that Schaffer had *no* exertional, postural, manipulative, visual, communicative or environmental limitations.  R. 263-265.

The problem with the ALJ's analysis is that the assessments provided by Dr. Fallica, Dr. Schiller and Barnes did not specifically address the particular limitations that were most relevant to Schaffer's case.  Although Schaffer partially relied on her mental impairments and exertional limitations as grounds for establishing her entitlement to DIB and SSI benefits, her primary basis for establishing the existence of her disability centered on her urinary and excretory problems.  In a function report submitted on March 24, 2007, Schaffer declared that a tumor on her spine had destroyed nerves located near her foot, thigh, vagina and buttocks.  R. 115.  According to Schaffer, this nerve damage caused her to have an enlarged bladder, resulting in urinary tract

21

infections and a corresponding need for her to catheterize herself. *Id.* She also stated that she was "scared to keep trying to work" because she had previously experienced "accidents" while working. *Id.*

At the hearing, Schaffer testified that she had undergone surgery on February 10, 2003. R. 29. Her medical records indicate that a schwannoma tumor was removed from her spinal cord on that occasion. R. 291. Schaffer explained that she often experienced numbness in her lower left extremity. R. 30. When questioned by her counsel, Schaffer testified that she had no feeling around her rectum, and that she could not recognize her need to defecate in the absence of cramping. R. 34. She stated that she wore protective undergarments while traveling away from home, since she could not predict when an unexpected bowel movement would occur. *Id.* She described situations in which she had discovered feces in her underwear only after lowering them in order to urinate. *Id.* These incidents, according to Schaffer, occurred at least once or twice per week. R. 33-34. She testified that she was more likely to experience fecal incontinence when she was "worked up," "nervous" or anxious. R. 40.

Schaffer also explained the nature of her urinary problems. She testified that because of her bladder impairment, she needed to catheterize herself three times per day (without exception). R. 35. According to Schaffer, each catheterization consumed approximately twenty to thirty minutes of her time. *Id.* She stated that she needed to catheterize herself *more* than three times per day when she felt "bloated." *Id.* Although she had recently moved outside of her mother's residence, Schaffer testified that she still lived across the street from her mother because she sometimes needed her mother's assistance to complete the catheterization process. R. 36. She advised that if she were to neglect to catheterize herself, she would experience severe

bladder infections.  R. 38.

An administrative law judge must give serious consideration to a claimant's subjective complaints even where such complaints are not corroborated by objective medical evidence. *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993).  In light of this principle, it follows *a fortiori* that serious consideration must be given to a claimant's testimony where such testimony *is* corroborated by objective medical evidence.  *Id.* at 1067-1068 ("Where medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be discarded unless there exists contrary medical evidence.").  The documentary record in this case substantiates Schaffer's testimony to a considerable degree.

As of January 6, 2003, Schaffer was experiencing urinary difficulties.  R. 144.  She reportedly was feeling the urge to urinate with increased frequency, and she was awakening roughly three times per night to urinate.  *Id.*  Her urinary stream was intermittent, leaving a post void residual inside of her bladder.  *Id.*  Schaffer indicated that she had been experiencing such symptoms for one to two years.  *Id.*  She was catheterized and given prescriptions for Flomax and Cipro.  *Id.*

Dr. David L. Kaufman ("Dr. Kaufman"), a neurosurgeon, evaluated Schaffer on January 7, 2003.  R. 225-227.  In a letter to Dr. Anisa Yunus ("Dr. Yunus"), Dr. Kaufman stated that Schaffer was suffering from a "progressively worsening bladder dysfunction."  R. 226.  Schaffer told Dr. Kaufman that she sometimes needed to push on her bladder in order to empty it, and that she would often have to urinate again within ten to twenty minutes.  R. 225.  Dr. Kaufman advised Schaffer to undergo surgery to remove a schwannoma tumor on her spine for the purpose of improving her symptoms.  R. 226-227.  Nevertheless, he warned Schaffer that "permanent

bladder dysfunction" was the "most significant risk" of the operation.  R. 227.

On January 24, 2003, Schaffer was catheterized again.  R. 230.  This action was taken because she had been unable to urinate despite having felt the urge to do so.  *Id.*  It was determined that she was suffering from a neurogenic bladder with an elevated post void residual. *Id.*

Dr. Kaufman surgically removed the schwannoma tumor from Schaffer's spine on February 10, 2003.  R. 179.  Nine days later, Schaffer still needed to catheterize herself even though she had begun to recover some of her bladder function.  R. 291.  During her stay at the hospital, however, she developed a yeast infection.  *Id.*

Schaffer was examined by Dr. Roberta Bashore ("Dr. Bashore"), her primary care physician, on May 21, 2003.  R. 179.  On that occasion, Dr. Bashore recorded the following observations about Schaffer's situation:

> She recently had surgery on her back because of her Schwannoma on 2/10.  Prior to this surgery she was having some difficulty with fecal incontinence.  Now she finds that even though she is mostly recovered from her surgery she is constantly worried about BMs.  She is frequently constipated and has trouble urinating on her own and has to cath herself.  She was given rx for PAXIL in the past but didn't take it any longer than 1-2 wks.  Her sleep she says is messed up–up all night and sleeps all day.  She has some interest in doing things but is afraid.  Has a lot of guilt feelings, worries about being embarrassed.

R. 179, 289.  Although Schaffer was suffering from depression, Dr. Bashore did not want to prescribe benzodiazepines because she feared that they would exacerbate Schaffer's urinary and constipation problems.  *Id.*

Schaffer underwent a pelvic ultrasound on May 27, 2003.  R. 157.  Dr. William N. Castle ("Dr. Castle"), Schaffer's urologist, confirmed that Schaffer was suffering from a neurogenic

bladder.  *Id.*  The ultrasound revealed that Schaffer's bladder was thickening.  *Id.*

On July 15, 2003, Dr. Castle examined Schaffer again.  R. 143.  At that time, Schaffer still had to catheterize herself on an occasional basis.  R. 142-143.  She continued to experience difficulties with her bowel movements.  *Id.*  In addition, she reported a numbness in her thighs and on the left side of her labia.  *Id.*  Dr. Castle instructed Schaffer to continue taking Flomax. *Id.*

Schaffer, who was pregnant, had a miscarriage on August 31, 2003.  R. 178.  She saw Dr. Castle again on October 8, 2003.  R. 141.  On that occasion, Dr. Castle reported that Schaffer was getting "recurrent urinary tract infections."  *Id.*  Although Schaffer's abdomen did not feel grossly extended on physical examination, Dr. Castle indicated that her bladder was not emptying well.  *Id.*  Schaffer was still catheterizing herself on an occasional basis.  *Id.*

On December 15, 2003, Schaffer was involved in a motor vehicle accident.  R. 177.  She was apparently "rear-ended" by a distracted driver.  *Id.*  In the aftermath of the accident, she experienced mild pain in her buttocks.  *Id.*  Dr. Bashore observed that Schaffer had "chronic numbness" in her left leg, which had not improved subsequent to her surgery.  *Id.*

At some point, Schaffer became pregnant again.  R. 140.  Her baby was due to be born in October 2004.  *Id.*  Her obstetrician-gynecologist was Dr. O.J. Lee ("Dr. Lee").  *Id.*  On July 16, 2004, Schaffer was admitted to Ohio Valley General Hospital for recurrent urinary tract infections and dehydration.  R. 140, 155.  Dr. Castle examined Schaffer in the hospital and determined that her bladder was not emptying well.  R. 140.  In a consultative memorandum dated August 3, 2004, Dr. Castle informed Dr. Lee that Schaffer had been instructed to "push fluids" and "straight cath" in order to empty her bladder.  R. 155.  On August 19, 2004, Schaffer

was told to continue taking Flomax throughout the duration of her pregnancy.  R. 139.

Schaffer evidently stopped catheterizing herself because of her pregnancy.  R. 137.  After delivering her baby, she did not return to Dr. Castle's office for two years.[6]  *Id.*  On September 7, 2006, Dr. Bashore reported that Schaffer had symptoms consistent with those of a urinary tract infection.  R. 173, 279.  Schaffer returned to see Dr. Castle on November 1, 2006.  R. 137.  Dr. Castle indicated that Schaffer was enduring recurrent urinary tract infections because she had stopped catheterizing herself during the course of her pregnancy.  *Id.*  On November 29, 2006, Dr. Castle observed that Schaffer was experiencing urinary frequency.  R. 136.  Schaffer was instructed to start catheterizing herself twice per day.  *Id.*  A pelvic ultrasound conducted on January 2, 2007, revealed that Schaffer had "a thickened bladder consistent with her previous history of [a] neurogenic bladder."  R. 156.  No other "obvious abnormalities" were noted.  *Id.*

Schaffer was examined by Dr. Bashore on April 19, 2007.  R. 268-269.  Dr. Bashore reported that Schaffer was experiencing anxiety, and that she wanted to have her mother with her on a constant basis.  R. 268.  This anxiety was expressly attributed to the fact that Schaffer had endured "more urinary incontinence" and was "losing control of her feces."  *Id.*  Schaffer informed Dr. Bashore that she had been having bowel movement "accidents."  *Id.*  At that time, Schaffer had "no rectal or genital sensation."  *Id.*  She was wearing protective undergarments designed to contain her urine and feces.  *Id.*  Schaffer told Dr. Bashore that she had recently caused her urethra to bleed while attempting to catheterize herself without a mirror, and that she

---

[6]Schaffer testified at the hearing that she lived with her four-year-old daughter.  R. 25. The Court assumes that Schaffer delivered her daughter during the fall of 2004, on or around her October due date, at which point she stopped catheterizing herself and temporarily discontinued her regular appointments with Dr. Castle.  R. 137.

needed to see a urologist. *Id.*

As of October 25, 2007, Schaffer had a bladder infection. R. 323. She attributed the infection to the repeated use of her catheter. *Id.* Her urine was cloudy, leading her to believe that she was suffering from another urinary tract infection. *Id.* She was given a prescription for Cipro. *Id.*

On January 25, 2008, Schaffer returned to Dr. Bashore's office. R. 318. A nurse noted that nothing was alleviating Schaffer's constipation. *Id.* It was also noted that while Schaffer's stool was sometimes so hard that she had to "manually disimpact herself," she would often have bowel movements when she became nervous. *Id.*

Schaffer scheduled a urological appointment for April 1, 2008. R. 312. Testing conducted on that occasion revealed that Schaffer had a moderate to large amount of "retained colonic stool" as a result of her "chronic constipation" and "impaction." *Id.* As of June 17, 2008, Schaffer was still suffering from urinary tract infections and catheterizing herself on an intermittent basis. R. 305.

This extensive documentary record generally substantiates Schaffer's testimony about her need to use a catheter, her fecal incontinence, and her need to wear protective underwear. There appears to be no question that Schaffer suffered from urinary and fecal impairments during the period of time at issue. *Quijano v. Secretary of Health & Human Services*, 791 F.Supp. 39, 41 (D.P.R. 1992)(observing that no evidence existed to contradict a claimant's assertion that he suffered from urinary incontinence). In his consultative examination report, Dr. Fallica acknowledged that Schaffer had complained of both pelvic numbness and unexpected bowel movements. R. 235, 237-238, 240. Schaffer also informed Dr. Fallica of her need to catheterize

27

herself three times per day.  R. 236.  Although Dr. Fallica's examination was of a psychological

nature (rather than of a physical nature), he opined that it was "doubtful" that the "neurological

effects" of Schaffer's back surgery would improve.  R. 240.  Moreover, Barnes' view that

Schaffer had no exertional, postural, manipulative, visual, communicative or environmental

limitations was not necessarily inconsistent with Schaffer's testimony and treatment record, since

her urinary and fecal impairments produced unique limitations that did not fit precisely within

any of those categories.  R. 263-265.  Whatever may be said about the ultimate question of

disability in this case, the existence of Schaffer's impairments does not appear to be in dispute.

The ALJ glossed over Schaffer's urological impairments by stating that she was no longer

seeing a urologist.  R. 16-18.  He attributed this finding to Schaffer's testimony.  R. 16-17.  In

fact, the ALJ mischaracterized the testimonial record.  Schaffer testified that she had not seen Dr.

Castle for "quite a while" because she had been catheterizing herself on her own.  R. 32.  She did

not testify that she had discontinued her urological treatment.  *Id.*  She was apparently attempting

to explain the circumstances under which she would have to return to Dr. Castle's office, at

which point the ALJ abruptly changed the subject to her mental health providers.  *Id.*  The

documentary record indicates that Schaffer had a urological appointment on April 1, 2008, which

was just over ten months prior to the hearing.  R. 21, 312.  She had previously gone two years

without seeing Dr. Castle, returning to his office only after experiencing "recurrent urinary tract

infections."  R. 137.  Schaffer's reason for not seeing a urologist during the ten months prior to

her administrative hearing was simply not explored by the ALJ.  R. 32.  By dismissing Schaffer's

complaints of significant urinary problems, the ALJ appears to have rejected competent medical

evidence for the "wrong reason."  *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).

The ALJ never even mentioned Schaffer's fecal incontinence in his opinion.[7]  R. 12-20. The transcript of the hearing indicates that while Schaffer was uncomfortable discussing the nature of her urinary and excretory impairments, her counsel informed her of the need to establish a detailed testimonial record.  R. 33, 40.  The case presented by Schaffer at the hearing was based almost entirely on her urinary and fecal problems.  Her anxiety was discussed only to the extent that it had caused her to experience unexpected bowel movements.  R. 40.  By focusing on Schaffer's mental problems (which were themselves the result of her urinary and fecal impairments) and deemphasizing the severity of her physical problems, the ALJ improperly circumvented the critical issues in this case.

The dispositive question is whether the ALJ adequately conveyed the nature and extent of Schaffer's limitations by informing Edelman that Schaffer needed to have "reasonable access to bathroom facilities."  R. 41.  The Court answers that question in the negative.  It cannot be doubted that *all* human beings may need "reasonable access to bathroom facilities," depending upon the meaning of the word "reasonable."  A more appropriate hypothetical question would have been more particularized about Schaffer's need to be away from her work station in order to catheterize herself or change her undergarments.  *Pearsall v. Massanari*, 274 F.3d 1211, 1216 (8th Cir. 2001)(approving of a hypothetical question indicating that a claimant with a neurogenic bladder "would require a permanent catheter change once a month, would need to urinate every 90 minutes, would occasionally suffer from incontinence, did not like to be around a lot of

---

[7]In light of the overwhelming documentary and testimonial evidence of Schaffer's urological and fecal impairments, it cannot be said that such evidence was so lacking in probative value, or so overwhelmed by contrary evidence, that it was permissible for the ALJ to implicitly reject it without explanation.  *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 203-205 (3d Cir. 2008).

people, had some anxiety and problems concentrating and had some dependency

characteristics"); *Middlemas v. Astrue*, Civil Action No. 08-621, 2009 U.S. Dist. LEXIS 19090,

at *32-33 (W.D.Pa. March 5, 2009)(remanding a case where a hypothetical question failed to

precisely account for the time that a claimant with urinary incontinence would need to spend in a

restroom); *Murphy v. Apfel*, Civil Action No. 99-471, 1999 U.S. Dist. LEXIS 22076, at *13-14

(D.Md. October 7, 1999)(approving of a hypothetical question indicating that a claimant with

urinary frequency needed to use a restroom "as often as needed"); *Pascariello v. Heckler*, 621

F.Supp. 1032, 1037 (S.D.N.Y. 1985)(remanding a case where an administrative law judge had

determined that a claimant's incontinence could be remedied or mitigated by an incontinence

product without making specific findings related to the amount of time that it would take the

claimant to change his underwear).  The ALJ never explained how often Schaffer would need to

catheterize herself during work hours, how often she would experience unexpected bowel

movements, and how long it would take her to change her undergarments and wash herself when

such unexpected bowel movements occurred.  Consequently, Edelman's testimony did not

constitute "substantial evidence" of the existence of jobs consistent with Schaffer's residual

functional capacity.  *Ramirez*, 372 F.3d at 552-555.

     At the hearing, the following colloquy occurred between Schaffer's counsel and Edelman:

ATTY:       If you add to the judge's hypothetical an individual who would
need to limit their work activity to 4 to 6 hour shifts on a daily
basis, an individual who required at least 2 unscheduled bathroom
breaks per day, so the opportunity to leave the workplace on an
unscheduled basis at least twice to go to the restroom and that
those time periods where she would be gone would last 15 to 20
minutes to take care of any cathing or clean up that would need to
take place and a person who is incontinent both in bowel and
bladder so that on occasion would experience incontinence and the

resulting difficulties with that.  In terms of experiences with co-workers, you know, there might be an opportunity where a co-worker would smell something or see something that would lead them to believe that the claimant was incontinent as well and so it would affect others in the workplace in that fashion.  In addition, an individual would suffer from panic attacks and/or crying spells that would last 10 minutes on an unscheduled basis one time a week just from the anxiety of dealing with the physical problems that they're dealing with.  Would such an individual be able to perform the jobs that you've cited for us?

VE:         No.

ATTY:       Would there be any other work available to such a person in the national economy?

VE:         No, those findings, there'd be no jobs.

R. 42-43.[8]  The ALJ discounted Edelman's answers to the questions posed by Schaffer's counsel on the ground that they reflected limitations that were inconsistent with his ultimate residual functional capacity finding.  R. 20.  This was not entirely improper, since the ALJ was free to reject those *particular* limitations that were not credibly established in the record.  *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005).  Nonetheless, the ALJ was *not* free to discount the limitations that *were* credibly established, nor was he free to completely ignore Schaffer's fecal incontinence.  *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 506 (3d Cir. 2009)(remanding a case in which an administrative law judge failed to explain the extent to which "a claimant's conditions, individually and collectively, impacted her workplace performance").

_____

[8]Schaffer testified that a public restroom would not provide a sufficiently clean environment to facilitate the performance of her catheterizations.  R. 38.  Although this issue was not reflected in her counsel's question to Edelman, it should be examined further on remand.

A judicially-ordered award of benefits is proper only where the record of a case has been fully developed, and where the evidence as a whole clearly warrants a finding of disability. *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000).  That standard is not met in this case.  While the ALJ's hypothetical question to Edelman did not sufficiently convey the nature and severity of Schaffer's limitations, the alternative hypothetical question posed by Schaffer's counsel may have included limitations that were either unsupported by the evidentiary record or otherwise subject to reasonable dispute.  R. 41-43.  Consequently, the proper remedy in this case is a remand for further administrative proceedings.  42 U.S.C. § 405(g).

On remand, the Commissioner must carefully consider the extent to which Schaffer's limitations impacted her workplace performance during the relevant period of time.  He should not overlook the fact that Schaffer appears to measure her alleged onset of disability from the date that she was terminated because of her inability to perform her duties.  R. 119.

**VI.     Conclusion**

The record contains overwhelming testimonial and documentary evidence that Schaffer suffers from serious urinary and fecal impairments.  The ALJ rejected evidence of Schaffer's urinary problems for the "wrong reason" and completely failed to address her fecal problems. Since even people without urinary and fecal impairments "need to have reasonable access to bathroom facilities," the ALJ's hypothetical question to Edelman failed to accurately portray a claimant who routinely needed to catheterize herself to avoid infection and who occasionally needed to change her undergarments and wash herself because of unexpected bowel movements. R. 41-42.  For these reasons, Edelman's testimony was not significantly probative of the existence of jobs consistent with Schaffer's actual residual functional capacity, and the

Commissioner's administrative decision is not "supported by substantial evidence" within the meaning of § 405(g).

Accordingly, the Court will deny the Commissioner's motion for summary judgment, deny Schaffer's motion for summary judgment to the extent that it seeks an award of benefits, and grant Schaffer's motion for summary judgment to the extent that it seeks a remand for further administrative proceedings.  The administrative decision of the Commissioner will be vacated, and the case will be remanded to him for further proceedings consistent with this opinion.  An appropriate order will follow.

Signed April 9, 2010.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:      All counsel of record

33